IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SIMONE GATLIN, on behalf of MGJ minor child, ) ) ) Plaintiff, ) ) v. ) ) RIDGELAND SCHOOL DISTRICT 122, et al., ) ) ) Defendants. ) | No. 23-cv-07661<br><br>Judge Andrea R. Wood |

## MEMORANDUM OPINION AND ORDER

MGJ is an African-American girl who claims that she experienced a racially hostile educational environment during her eighth-grade year at Simmons Middle School ("Simmons"). The racial harassment culminated in a fight involving MGJ and one of the harassers. As a result of that altercation, MGJ was barred from attending Simmons in-person for the remainder of the school year. Plaintiff Simone Gatlin, on behalf of her daughter MGJ, brought the following lawsuit contending that Defendants Ridgeland School District 122 ("District"), the Board of Education of Ridgeland School District 122 ("Board"), and Tracy Flood, Simmons's principal, were deliberately indifferent to the racially hostile educational environment at Simmons. Thus, Gatlin's complaint asserts claims under Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d; 42 U.S.C. §§ 1983 and 1986; and Illinois state law. Defendants have filed a motion dismiss Gatlin's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 16.) For the reasons that follow, Defendants' motion is granted.

### BACKGROUND

For the purposes of the motion to dismiss, the Court accepts all well-pleaded facts in the complaint as true and views those facts in the light most favorable to Gatlin as the non-moving

party. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). The complaint alleges as follows.

MGJ is an African-American girl who, at all relevant times, was a student at Simmons, a school within the District. (Compl. ¶¶ 1–2, 4, 9, Dkt. No. 1.) While enrolled at Simmons, MGJ was on the honor roll and played in the school's band. (*Id.* ¶ 10.) She was also one of just a few Black students in her grade level. (*Id.* ¶ 48.)

During the 2021–22 school year, the unrest surrounding George Floyd's murder began to cause conflict amongst Simmons's students. (*Id.* ¶ 11.) In particular, some non-Black students would mockingly use the phrase "I can't breathe" and routinely use the n-word. (*Id.* ¶ 12.) One of the worst offenders was Student D, who would refer to Black people as "underground creatures" and "monkeys." (*Id.* ¶ 13.) Eventually, a Black student in MGJ's grade, ZS, reported Student D and the other racist incidents to Simmons's administration, including Derek Simpson and School Dean Summers.[1] (*Id.* ¶¶ 14, 56, 131.) According to ZS, Summers took notes of what ZS reported to him and claimed that he would "look into it" but never followed up, leaving ZS and his mother uncertain of whether any investigation was undertaken. (*Id.* ¶ 15.)

In May 2022, Student D bullied ZS's cousin, THJ, based on her race, Black, when he and some friends called her an "under-formed" animal. (*Id.* ¶¶ 16–17, 48.) After THJ asked Student D what he meant, Student D responded that she was a monkey and made monkey sounds. (*Id.* ¶ 18.) ZS witnessed the event, and he reported it to Summers the next day. (*Id.* ¶ 19.) In addition, ZS and his cousins confronted Student D at an off-campus park about his treatment of ZS and THJ. (*Id.* ¶¶ 20–21.) When ZS was not looking, Student D threw ZS to the ground and sucker

---

[1] Besides referring to him as part of Simmons's administration, the complaint does not specify Simpson's role. In addition, the complaint refers to Summers only by his last name.

punched him. (*Id.* ¶ 22.) Nearby students recorded the altercation on their phones, which led to ZS and Student D being called into Summers's office. (*Id.* ¶¶ 23–24.) At the meeting, Student D acknowledged that ZS had been standing up for THJ, and ZS further explained that Student D had been racially harassing THJ. (*Id.* ¶¶ 25–26.) Yet Simmons's administration again appeared to fail to follow up on ZS's report of race-based harassment. (*Id.* ¶ 27.) Likewise, a second student, AB, racially harassed THJ over the course of the 2021–22 school year with ZS's complaints regarding that student receiving no response. (*Id.* ¶ 29.)

The racial harassment continued into the 2022–23 school year, which was MGJ's eighth-grade year. (*Id.* ¶¶ 32–33, 35.) Early in the school year, ZS's mother reported to the administration that students were calling her son a gorilla, and the administration simply told her that they would look into it. (*Id.* ¶ 36.) In August 2022, during science class, AB overheard a conversation between ZS and another student regarding an incident of police brutality against a Black man. (*Id.* ¶ 38.) AB interrupted to say, "Black lives don't matter." (*Id.* ¶ 40.) Despite ZS asking her to stop, AB then continued with additional racist statements such as, "Black people belong in dog pounds" and "Black people blew up my church," and made repeated use of the n-word. (*Id.* ¶ 43.) Meanwhile, the science teacher did not intervene; ZS believed that the teacher "didn't want to hear." (*Id.* ¶ 45.) Later that day, AB again used the n-word in front of ZS during gym class. (*Id.* ¶ 46.)

After gym class on August 31, 2022, students approached MGJ and THJ to tell them what AB said. (*Id.* ¶¶ 48, 54.) THJ then explained to MGJ that AB had racially bullied THJ and other minority students the previous school year, and Simmons's administration had done nothing about it. (*Id.* ¶ 50.) MGJ herself had once heard AB use the n-word in the school hallway. (*Id.* ¶ 51.) Thus, MGJ approached AB and asked her if she had actually made the racist

3

remarks that had been reported to MGJ. (*Id.*) In response, AB turned red, which MGJ interpreted as confirmation that AB had, indeed, made the remarks as accused. (*Id.* ¶ 52.) Given Simmons's administration's failure to take action against the racial harassment of which it had been made aware, MGJ decided to handle the matter herself. (*Id.* ¶ 53.) Near the end of that school day, MGJ and THJ joined together to fight AB. (*Id.* ¶ 54.) Immediately after the fight, MGJ went home and told her mother about it. (*Id.* ¶ 55.)

The following morning, on September 1, 2022, MGJ, her father, and her mother, Plaintiff Simone Gatlin, met with Simpson and Simmons's principal, Defendant Tracy Flood. (*Id.* ¶¶ 3, 59.) At the meeting, MGJ explained that she and THJ had fought with AB after hearing about AB's racist statements in science class and expressed frustration that the administration had done nothing to stop such racist behavior. (*Id.* ¶ 61.) MGJ went on to tell Flood and Simpson about how she was being racially harassed, including through use of the n-word, and how she wanted AB to stop bullying her and other minority students. (*Id.* ¶ 62.) In response, Flood told MGJ that she and Simpson would investigate MGJ's claims. (*Id.* ¶ 65.) Nonetheless, MGJ was provided with a notice of a ten-day suspension and was also informed that an additional investigation would be conducted. (*Id.* ¶ 67.) On September 7, 2022, MGJ and her parents had a second meeting with Flood and Simpson, as well as District Superintendent Joseph Matise. (*Id.* ¶ 70.) During this meeting, Gatlin provided the administrators with additional evidence regarding AB's history of racist behavior and was told that those allegations were still being investigated. (*Id.* ¶¶ 72–73.) Notwithstanding the ongoing investigation, Matise informed MGJ and her parents that a decision had been made to expel MGJ. (*Id.* ¶¶ 73–74.)

To avoid MGJ's formal expulsion, Gatlin signed an Expulsion in Abeyance Agreement under which MGJ's expulsion was paused and she would instead receive District-provided

remote instruction for five hours a week and be permitted to participate in graduation. (*Id.* ¶¶ 78, 88.) In exchange, Gatlin agreed that MGJ would not be permitted to attend Simmons in-person or participate in school activities, including band, for the remainder of the school year. (*Id.* ¶¶ 78, 90.) Although the District promised, and Illinois law required, that MGJ receive at least five hours of remote instruction per school day, MGJ often received only one hour on many days and on some days received none. (*Id.* ¶¶ 92–93.) Over the rest of that school year, Gatlin was consistently in contact with Simpson about her concerns with the quality of instruction that MGJ was receiving remotely. (*Id.* ¶ 135.) On April 4, 2023, about a month after Gatlin's attorney filed a complaint against the District with the U.S. Department of Education's Office of Civil Rights, Matise emailed Gatlin about MGJ's potential return to school. (*Id.* ¶¶ 127–28.) Given that only a month remained in the school year, Gatlin declined Matise's offer for MGJ to return to in-person instruction. (*Id.* ¶ 131.)

## DISCUSSION

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

Gatlin's nine-count complaint asserts the following claims under federal law: a claim against the District and the Board for violation of Title VI (Count I); § 1983 claims for violations of the Equal Protection Clause of the Fourteenth Amendment against Flood (Count II) and

against the Board and District pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978) (Count III); and a claim against Flood under 42 U.S.C. § 1986 claim for neglecting to prevent a 42 U.S.C. § 1985 conspiracy (Count IV). In addition, the complaint asserts the following claims under Illinois state law: negligence against the District and the Board (Count V); willful and wanton supervision against Flood (Count VI) and against the District and the Board (Count VII); willful and wanton hiring and retention against the District and the Board (Count VIII); and intentional infliction of emotional distress against Flood (Count IX). Defendants argue for the dismissal of all claims.

### I. Claims Against the District

Before turning to the merits of Gatlin's complaint, the Court first addresses Defendants' contention that the District is not a proper party. Several of the claims in Gatlin's complaint are brought against both the District and the Board. However, Defendants contend that the Board is the only legal entity capable of being sued. As Defendants correctly note, Illinois law "authorizes a board of education to sue and be sued in court proceedings." *Bd. of Educ. Bremen High Sch. Dist. No. 228 v. Mitchell*, 899 N.E.2d 1160, 1166 (Ill. App. Ct. 2008) (citing 105 ILCS 5/10-2). And Gatlin does not contest that it is the Board, not the District, that is the proper party with respect to her claims. For that reason, the Court dismisses the claims against the District with prejudice.

### II. Title VI

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Likewise, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), "makes the same guarantee but substitutes 'on the basis of sex' for 'on the ground of

6

race, color, or national origin.'" *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014). Courts generally treat decisions interpreting Title IX as equally applicable in the Title VI context and vice versa. *Id.* Accordingly, this Court will rely on both Title VI and Title IX caselaw in evaluating Gatlin's Title VI claim.

In certain circumstances, a school receiving federal funding[2] can be held liable for student-on-student harassment. *Id.* However, "[t]he Supreme Court has set a high bar for plaintiffs seeking to hold schools and school officials liable for student-on-student harassment." *Id.* To hold a school liable, "[a] peer-harassment plaintiff must demonstrate that the harassment was discriminatory, the school officials had 'actual knowledge' of the harassment, the harassment was 'so severe, pervasive, and objectively offensive that it deprives the victims of access to educational opportunities,' and officials were 'deliberately indifferent' to the harassment." *Id.* (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)). Deliberate indifference allows for liability "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. At minimum, it requires that the school officials' conduct "cause[d] students to undergo harassment or make them liable or vulnerable to it." *Id.* at 645.

There is no question that Gatlin has alleged several instances of racially discriminatory harassment occurring at Simmons, and for purposes of the motion to dismiss the Court accepts those allegations as true. Allegations that students used the n-word, referred to Black people as monkeys or other animals, and told Black students that "Black lives don't matter" plainly plead harassment motivated by anti-Black hostility. And that conduct was undeniably severe and

---

[2] The complaint alleges and Defendants do not dispute that the Board is a recipient of federal financial assistance as required for liability under Title VI. (Compl. ¶ 146.)

objectively offensive, as it involved odious racist insults. *See, e.g.*, *DiStiso v. Cook*, 691 F.3d 226, 242 (2d Cir. 2012) ("Defendants do not—and cannot—dispute that . . . use of the reviled epithet [the n-word] raises a question of severe harassment going beyond simple teasing and name-calling."); *T.B. ex rel. Bursch v. Indep. Sch. Dist. 122*, 620 F. Supp. 3d 818, 831 (D. Minn. 2022) (finding that evidence of students calling a Black student by racial slurs like the n-word and comparing him to a monkey demonstrated an issue of fact as to the existence of severe, pervasive, and objectively offensive harassment). The problem, however, with respect to Gatlin's Title VI claim is that the complaint fails to plead that any of that harassment was directed at MGJ. Rather, the complaint's specific examples of racial harassment focus largely on the acts of two students, Student D and AB. And that harassment was directed not at MGJ, but ZS and THJ, neither of whom are plaintiffs in this case. Indeed, MGJ's name is conspicuously absent from the complaint's allegations of racial harassment that occurred during the 2021–22 school year. (*See* Compl. ¶¶ 11–29.)

True, courts have held that "racist attacks need not be directed at the [plaintiff] in order to create a hostile educational environment." *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033 (9th Cir. 1988); *see also Sneed v. Austin Indep. Sch. Dist.*, 490 F. Supp. 3d 1069, 1083 (W.D. Tex. 2020) ("[T]he Fifth Circuit has noted that racist attacks do not need to be directed at a plaintiff in order to establish the requisite racially hostile environment." (citing *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 409 (5th Cir. 2015))). At the same time, the plaintiffs in those cases were also around and exposed to the hostile educational environment and were direct targets of the harassment in some instances. *Monteiro*, 158 F.3d at 1034; *Fennell*, 804 F.3d at 402–06; *Sneed*, 490 F. Supp. 3d at 1083. By contrast, as pleaded here, MGJ did not personally witness the racial harassment directed at ZS and THJ, and did not even hear about it

8

until the day of the fight that led to her suspension. (*See* Compl. ¶ 50 ("MGJ was made aware by another student, THJ[,] that AB had bullied, harassed, and intimidated her and other Minority students in the prior school year (2021–22) and nothing was done about it, even though the school was made aware."); *id.* ¶ 119 ("THJ and MGJ were never friends, did not have each other's phone number, did not converse on social media at all prior to the incident, and MGJ did not even have Snapchat or Instagram.").)

Indeed, the only allegation of MGJ's own exposure to a racially offensive incident is that MGJ once overheard AB use the n-word in the hallway early in the 2022–23 school year. (*Id.* ¶ 51.) While that single incident involved a deeply offensive word, AB did not use the word to refer specifically to MGJ or even in a conversation of which MGJ was a part. *See Ervins v. Sun Prairie Area Sch. Dist.*, 609 F. Supp. 3d 709, 722 (W.D. Wis. 2022) ("[A] hostile environment claim requires much more than a single upsetting episode."). More importantly, Gatlin concedes that MGJ did not report that incident prior to her fight with AB. (Pl.'s Opp'n at 7, Dkt. No. 24 ("MGJ did not report any alleged bullying until afterwards . . . .").) Yet Simmons "can only be liable for harassment about which it has actual knowledge." *Gabrielle M. v. Park Forest-Chi. Heights Sch. Dist. 163*, 315 F.3d 817, 823 (7th Cir. 2003). "School administrators have actual knowledge only of the incidents that they witness or that have been reported to them." *Galster*, 768 F.3d at 618; *see also C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 542 (7th Cir. 2022) ("[T]he actual knowledge inquiry, by its terms, asks whether a responsible decisionmaker had notice of an act of completed discrimination on the basis of a student's sex."). And Simmons's administration cannot be deliberately indifferent to incidents about which it is unaware. *N.K. v. St. Mary's Springs Acad. of Fond Du Lac Wis., Inc.*, 965 F. Supp. 2d 1025, 1036 (E.D. Wis. 2013) ("[T]he Court must remain cognizant of the fact that it may only look to instances where

9

[the school] had at least actual notice of the incidents to determine that they were deliberately indifferent to those incidents.").

Further, Gatlin's allegations do not demonstrate that any racial hostility to which MGJ might have been exposed was connected to a denial of educational opportunities. *See C.S. v. Couch*, 843 F. Supp. 2d 894, 907 (N.D. Ind. 2011) ("While [the pleaded] racially hostile comments and racially motivated violence arguably created a severe and objectively offensive racial environment, [the plaintiff] fails to make the necessary link between this environment and a denial of educational opportunities and further fails to demonstrate a concrete, negative effect on his education as required by *Davis*."). "[A]n action under Title [VI] lies only where the behavior at issue denies a victim equal access to education." *Gabrielle M.*, 315 F.3d at 823. For a plaintiff to demonstrate a deprivation of access to educational opportunities, "[t]he harassment must have a 'concrete, negative effect' on the victim's education." *Id.* (quoting *Davis*, 526 U.S. at 654). Examples include "dropping grades, becoming homebound or hospitalized due to harassment, or physical violence." *Id.* (citations omitted).

Here, the complaint fails to adequately plead that the racial harassment at Simmons deprived MGJ of access to educational opportunities. Many courts have recognized that "the educational opportunities and benefits to which a victim's access is affected need not necessarily be tangible," and can "include an academic environment from free racial hostility." *M.R. v. Burlington Area Sch. Dist.*, No. 21-CV-1284-JPS, 2023 WL 3510642, at *17 (E.D. Wis. May 17, 2023) (quoting *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 666 (8th Cir. 2012)). But, as discussed above, the complaint indicates that MGJ had minimal, if any, awareness of the racial bullying endured by ZS and THJ prior to the fight on August 31, 2022. Thus, the bullying suffered by those students, without more, does not suffice to plead that MGJ was denied an

10

academic environment free from racial hostility. *See Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 363 (6th Cir. 2012) ("Incidents involving third-party victims lack relevance unless the plaintiff can show that the incidents deprived ***her*** of [access to educational opportunities or benefits]."). Nor does the complaint connect any awareness MGJ had of the racial harassment experienced by ZS and THJ to any negative effect on her grades, attendance, or mental health.

After MGJ's fight with AB, MGJ was deprived of access of educational opportunities due to her suspension. However, "liability under Title VI for student-on-student harassment requires that the plaintiff be denied an educational opportunity by the harasser's actions." *Couch*, 843 F. Supp. 2d at 909. As described in the complaint, it appears that, upon learning about AB's bullying from THJ along with THJ's belief that Simmons's administration had not done enough to stop it, MGJ took it upon herself to swiftly address AB's misconduct. And MGJ's suspension was due to her own actions in deciding to deal with the harassment by initiating a physical fight with AB. *Id.* ("[The plaintiff's] expulsion was a result of his ***own*** actions rather than any racial harassment by other students."). Once MGJ decided to use violence against AB, the school was justified in imposing discipline. That MGJ initiated the encounter for understandable and even sympathetic reasons does excuse that behavior; Simmons's administration is entitled to take disciplinary action to discourage minor students from resorting to violence as a means of conflict resolution.

In short, MGJ has failed to adequately plead that she personally experienced a racially hostile educational environment that caused her a deprivation of educational opportunities. Her Title VI claim is therefore dismissed without prejudice.

### III. Section 1983

Gatlin also asserts § 1983 claims alleging violations of MGJ's Fourteenth Amendment right to equal protection of the law. In Count II, Gatlin asserts that Flood, Simmons's principal,

11

violated MGJ's equal protection rights by being deliberately indifferent to the racial bullying and harassment occurring at Simmons and then punishing MGJ, a Black student, more harshly than the white students whose bullying provoked MGJ to fight back. And Count III seeks to hold the Board liable under *Monell*, claiming that Flood's conduct was the result of the Board's failure to adopt and maintain adequate policies, procedures, and training to address racial bullying and harassment.

As to Flood, to state a § 1983 equal protection claim, Gatlin must plead that (1) Flood discriminated against MGJ because of MGJ's race, Black, and (2) Flood "acted with a nefarious discriminatory purpose." *Doe v. Evergreen Park Elementary Sch. Dist. 124*, No. 17-CV-3774, 2017 WL 6731867, at *8 (N.D. Ill. Dec. 29, 2017) (quoting *D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 799 (7th Cir. 2015)). Demonstrating the requisite discriminatory intent requires showing "intentional discrimination against [MGJ] because of her membership in a particular class [*i.e.*, because she was Black], not merely that she was treated unfairly." *Id.* (quoting *Trautvetter v. Quick*, 916 F.2d 1140, 1150 (7th Cir. 1990)).

Insofar as Gatlin bases her equal protection claim against Flood on the purported racial harassment that occurred at Simmons prior to MGJ's fight with AB, the complaint lacks sufficient allegations concerning Flood's personal involvement. "Because there is no theory of *repondeat superior* for constitutional torts, a plaintiff 'must plead that each Government-official defendant, through the official's own actions, has violated the Constitution.'" *T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 676). Yet the complaint contains no allegations regarding Flood's awareness of the racial harassment happening at Simmons prior to the events of August 31, 2022. Indeed, the only allegations before that date involving Flood relate to her rejection of MGJ's request "to switch class teams"—a request that, as pleaded, had

12

no apparent connection to a racially hostile educational environment but rather was made "due to [MGJ's] social anxiety." (Compl. ¶ 30.) Gatlin cannot maintain an equal protection claim alleging that Flood was deliberately indifferent to racial harassment occurring at Simmons of which she had no actual knowledge. *Evergreen Park*, 2017 WL 6731867, at *9 ("Simply put, Plaintiff has failed to allege that Defendants had actual knowledge that Plaintiff or any other female students were harassed on the basis of sex, and accordingly, Plaintiff's Equal Protection claim fails."); *see also T.E.*, 599 F.3d at 588 ("While it appears that our precedent would have previously allowed a plaintiff to recover from a supervisor based on that supervisor's 'deliberate indifference' toward a subordinate's purposeful discrimination, after *Iqbal* a plaintiff must also show that the supervisor possessed the requisite discriminatory intent." (citation omitted)).

The allegations of Flood's involvement focus more on her role in disciplining MGJ after her fight with AB. And Gatlin argues that the decision to suspend MGJ for the remainder of the school year despite her previously unblemished record demonstrates that Flood treated MGJ more harshly because she was Black. As an initial matter, the Court observes that the complaint alleges that the deliberations regarding MGJ's discipline involved not just Flood but also the District Superintendent and Simpson, yet the equal protection claim is brought against Flood alone. In any case, the Court finds that the complaint's allegations as to Flood do not suffice allege that she acted with discriminatory intent. That Simmons's administration imposed a harsh punishment on a student who initiated a physical altercation with another student is not so unusual or disproportionate as to raise an inference of discrimination. And it is well-established that such decisions are entitled to substantial deference because "[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion." *Wood v. Strickland*, 420 U.S. 308, 326 (1975).

13

For an equal protection claim to lie, it is not enough for Gatlin to allege that MGJ was harshly disciplined and she was Black. Rather, she must sufficiently allege that Flood "treated other students, who were not members of a protected class differently." *Evergreen Park*, 2017 WL 6731867, at *9 (internal quotation marks omitted). Put differently, Gatlin's allegations must at least support a reasonable inference that Flood singled out MGJ for disparate treatment because she was Black and "selected [her] course of action at least in part for the purpose of causing its adverse effects on the identifiable group." *Id.* (quoting *Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946, 951 (7th Cir. 2002)). Notably, Gatlin's opposition brief does not point to any allegations in the complaint that show that a similarly situated non-Black student was treated more leniently than MGJ. Although unmentioned by Gatlin in her opposition brief, the Court does briefly note that Gatlin might have cited the incident where Student D punched ZS as an example of a non-Black student being punished more leniently than MGJ. But that comparison proves unavailing, as the complaint is silent about what, if any, punishment Student D received for that misconduct. In any case, Student D was not similarly situated to MGJ, given that Student D's misconduct happened off school grounds where Illinois public schools do not have the same disciplinary authority.[3] *See* 105 ILCS 5/24-24 ("[T]eachers [and] other certified educational employees . . . shall maintain discipline **in the schools,** including school grounds which are owned or leased by the board and used for school purposes and activities." (emphasis added)).

---

[3] The complaint does allege that ZS, a Black student, received a two-day in-school suspension after he stated during his meeting with Dean Summers that he would have defended himself against Student D's attack had he not been in a cast. (Compl. ¶ 26.) But the complaint explains that ZS was punished because Simmons's administration considered his statement to be "a threat." (*Id.*) And since that threat was made on school grounds and in front of a school administrator, the school had greater authority to impose punishment for that misconduct.

Because Gatlin fails to allege that Flood took any action toward MGJ with the specific intent to discriminate against her as a Black student, Count II's equal protection claim against Flood is dismissed without prejudice. Since Gatlin has failed to plead an equal protection claim as to Flood and has alleged no other theory of an equal protection violation, the *Monell* claim against the Board necessarily fails too. *E.g.*, *Doe v. Sch. Dist. 214*, 532 F. Supp. 3d 665, 684 (N.D. Ill. 2021) ("Without an underlying constitutional violation, [the] *Monell* claim necessarily fails as well."). Accordingly, Count III is dismissed without prejudice.

### IV. Section 1986

The remaining federal claim asserted in the complaint is Count IV's 42 U.S.C. § 1986 neglect-to-prevent claim against Flood. Section 1986 provides, in relevant part, as follows:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in [42 U.S.C. § 1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, if such wrongful act be committed, shall be liable to the party injured . . . for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented.

Defendants argue that the § 1986 claim must be dismissed with prejudice because the complaint was filed after the statute's one-year statute of limitations had run. 42 U.S.C. § 1986 ("But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.").

Generally, a complaint need not state all facts necessary to overcome an affirmative defense like the statute of limitations, which is why it is "irregular to dismiss a claim as untimely under Rule 12(b)(6)." *Hollander v. Brown*, 457 F.3d 688, 691 n.1 (7th Cir. 2006) (internal quotation marks omitted). Dismissal on statute of limitations grounds at the pleading stage may be warranted, however, when a plaintiff pleads facts that effectively establish the defense. *Id.*

15

Here, Gatlin initiated the action on September 7, 2023. "Ordinarily, a civil rights claim accrues at the time a person becomes or should have become aware that she was injured, that is when she knows or should have known her constitutional rights have been violated." *Anderson v. Cornejo*, 199 F.R.D. 228, 250 (N.D. Ill. 2000). But the Court finds that there is considerable uncertainty as to the contours of MGJ's injury for § 1986 purposes and that, in turn, creates uncertainty as to the date on which it accrued. For that reason, the Court declines to dismiss the § 1986 claim on statute of limitations grounds.

Although the § 1986 claim is not plainly time-barred, the Court nonetheless finds that it is not sufficiently pleaded. "Because a § 1986 claim predicates liability on the failure to prevent a § 1985 conspiracy from occurring, if there is no § 1985 claim, there can be no § 1986 claim." *Yates v. H&M Int'l Transp., Inc.*, No. 18-cv-6001, 2019 WL 2994527, at *7 (N.D. Ill. July 9, 2019). Within the count setting out her § 1986 claim, Gatlin alleges the existence of a § 1985(3) conspiracy pursuant to which "AB and other Caucasian students sought to deprive MGJ and other Minority students and succeeded in so doing, of equal educational opportunities because of race." (Compl. ¶ 209.) This single conclusory allegation however, does not suffice to plausibly allege that the minor students' racist bullying was in fact a coordinated conspiracy to deprive Simmons's Black students of their constitutional rights. To plead a conspiracy under § 1985(3), the complaint must adequately allege "an express or implied agreement among" the coconspirators. *Milchtein v. Milwaukee County*, 42 F.4th 814, 827 (7th Cir. 2022). Yet the complaint contains no allegations from which it can be reasonably inferred that the central figures in the racist harassment, Student D and AB, even knew each other. Further, a necessary element of a § 1985(3) claim is that the conspiracy cause the plaintiff injury. *Id.* The claimed injury to MGJ is her loss of equal educational opportunities. As discussed above, Gatlin has

16

failed to adequately plead such an injury to MGJ. Absent constitutional injury, the complaint states no § 1985(3) claim. Without an adequately alleged § 1985(3) wrong, there is nothing for which Flood can be held liable for failing to prevent under § 1986, and that claim is dismissed without prejudice.

V.      **State-Law Claims**

With the dismissal of all the federal claims over which this Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, the Court must now decide whether to relinquish its supplemental jurisdiction over the remaining state-law claims. *See* 28 U.S.C. § 1367. "Although the decision is discretionary, when all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over supplemental state-law claims." *RWJ Mgmt. Co. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012) (internal quotation marks omitted). That presumption can be rebutted under certain circumstances, including where:

> (1) the statute of limitations has run on the pendant claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendant claims can be decided.

*Id.* at 480. The circumstances here do not rebut the presumption in favor of relinquishing federal jurisdiction. The matter is still in its early stages and there are no pressing statute of limitations issues. In addition, the viability of Gatlin's state-law claims turns on matters related to Defendants' claim of immunity under the Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/1-101 *et seq.*, and it is not absolutely clear whether the state-law claims must be dismissed on that basis. Consequently, the Court declines to exercise supplemental jurisdiction over the state-law claims.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (Dkt. No. 16) is granted. Gatlin's claims against the District are dismissed with prejudice, as it is not a proper party to this lawsuit. The federal claims in Counts I, II, III, and IV are dismissed without prejudice for failure to state a claim. With the federal claims dismissed, the Court relinquishes supplemental jurisdiction over the state law claims in Counts V, VI, VII, VIII, and IX, and those claims are dismissed without prejudice as well. However, Gatlin is granted leave to file an amended complaint that remedies the pleading deficiencies in the federal claims by October 20, 2025. If Gatlin declines to do so, the federal claims in Counts I, II, III, and IV will be dismissed with prejudice.

ENTERED:

Dated: September 28, 2025

_____
Andrea R. Wood
United States District Judge